Case number 25752 Matthew Butler v. Ferguson Enterprises Inc. Argument not to exceed 15 minutes per side. Mr. Marcus, you may proceed for the appellant. Good afternoon. Welcome to the Court of Appeals. We are prepared for your cases this afternoon. Judge Batchelder is participating, but she's participating by audio only. Counsel for appellant, you may proceed. Thank you, Your Honors, and may it please the Court, Christopher Marcus for the appellant, Matt Butler. I would like to reserve three minutes for rebuttal. Very well. The District Court erroneously agreed with Ferguson, the appellee in this case, in concluding that it makes no economic sense for Ferguson to purchase a company for $210 million and then adopt policies with the potential $6.67 million earn out. In fact, such actions made perfect economic sense from Ferguson's perspective. Because Ferguson is Signature's parent, Signature's profits became Ferguson's profits, but Ferguson's profits from its non-signature assets never became Signature's profits. This structure is what gave Ferguson the means, motive, and opportunity to manipulate Signature's trading profit, that is, the number used to determine whether the earn out obligation was triggered, without harming its own bottom line. Ferguson took full advantage of this structure to intentionally reduce Signature's trading profit and avoid the 2018 earn out payment it owed to Mr. Butler. The first action Ferguson took with the intent of avoiding a 2018 earn out was its implementation of an accounting rule with Signature called the 12-month rule. All right, Mr. Marcus, this is an appeal from the grant of a motion to dismiss based upon 12b-6. That's correct. So are these facts that you're reciting contained in your complaint? They are, Your Honor, and the 12-month rule that I'm discussing right now, these facts are the paragraphs 56 through 64 of Mr. Butler's amended complaint, which is the opposite. Basically, your argument is that you have plausibly alleged basically what you've told us. That's correct. And that they had the motive and the opportunity and the means to do their actions to harm your client. Okay, I think I understand your position. This is, on the pleadings, it's not even summary judgment. It's on the basis that the allegations are not plausible, I guess. That's the Trombley standard. I assume that's what Judge Bunny must have applied here. That's correct, Your Honor. That's the applicable standard and the one Judge Bunny applied in this case. Okay, I think I thoroughly understand your argument. Maybe the other judges have some questions? Judge Bush, Judge Batchelder, do you? I think you stated it fairly succinctly, Judge Griffin. I do not currently have any questions. All right. I've got questions for the other side because I think it's unusual for an issue of unless the allegations are not plausible, usually at least proceed to discovery. That hasn't occurred here. It's up to you, Mr. Marcus, but you could preserve all the rest of your time for rebuttal, which may be in your interest, if you wish. Your Honor, I would like to proceed with just a little bit more discussion about that intent rule that the court has usually not appropriately decided on the pleading stage and, in fact, was not appropriately decided at the pleading stage of this case either. As the court is already aware, Ferguson's intent is important in this case because the party's agreement forbids Ferguson from directly or indirectly taking any actions with the intent of avoiding the amount of Mr. Butler's burnout and under Kentucky law, which governs the agreement of issue in this case, intent means the desire to cause the consequences of the act or the belief that the consequences are substantially certain to result from it. And this court has repeatedly observed that claims involving proof of a defendant's intent seldom lend themselves to summary judgment or summary disposition. The court recognized that back in the Holzemer v. City of Memphis case that we cite in our brief, and I think that proposition rings even more true at the pleading stage. And not only that, the facts in the amended complaint fit hand in glove with Kentucky's definition of intent. The amended complaint alleged facts to show that Ferguson knew that the consequence of the 12-month rule was a reduction in signatures trading profit and the resultant avoidance of the earn out payment. How did Ferguson know that? Mr. Butler, my client, specifically alleged in the amended complaint that he told a vice president of Ferguson named Chip Devine of the negative impacts of the 12-month rule on signatures trading profit. Again, that's the metric for determining whether the earn out obligation had been triggered. And Mr. Devine acknowledged this fact by promising that Ferguson would repeal the 12-month rule and then credit the 2018 trading profit calculation by more than a million dollars. With full knowledge of the effects of the 12-month rule, Ferguson decided to break those promises. One plausible explanation of why Ferguson failed to honor its promises is that it implemented the 12-month rule with the intent to avoid the earn out. And one plausible explanation is all that Mr. Butler must show to overcome Rule 12B6 dismissal of his amended complaint. As this court has recognized in the Watson Carpet versus Mohawk Industries case that we cited in our brief, ferreting out the most likely reason for the relatively in the Doe v. Baum case that we cite in our brief, this court stated that the plaintiff's allegations only need to give rise to one plausible explanation of the defendant's conduct. They need not be the only plausible explanation. In a similar vein, again, going back to intent, Ferguson knew that by implementing what we've described in our pleadings and in briefs in this court is the own store brand scheme, the result would be that certain of signature sales and the resultant profits from those sales would be shifted to Ferguson, thereby reducing signatures trading profit. One plausible explanation of why Ferguson nevertheless proceeded with this scheme, even as Mr. Butler voiced his objections to it and told Ferguson, hey, this is going to have a negative impact on trading profit, is that the scheme was carried out with intent to avoid the earning. Likewise, Ferguson knew when it decided in January of 2018 to pay signature employees bonuses, irrespective of the company's financial performance, one consequence would be an immediate reduction of signatures trading profit because the unearned bonus payments were an expensive signature with no offsetting profit. But Ferguson did it anyway. Again, one possible explanation and that's all we need to show is that Ferguson took this action to avoid the earning. Is there anything in the in the purchase agreement talking about how Ferguson might change the operations of signature after the acquisition? Yes, Your Honor, thank you. Section 1.06a of the Membership Interest Purchase Agreement, which is the agreement at issue in this case, says that Ferguson has sole discretion to operate signatures business after the acquisition. But in that same sentence, it's a one sentence section of the agreement that says provided that and the second item after provided provided that is that Ferguson is forbidden from taking any direct or indirect actions with the intent of avoiding or reducing the earn out. So in Section 1.06a, there's two clauses that are relevant to Ferguson's operations of signatures business. Initially, we see that Ferguson is afforded discretion to operate signatures business, but then that discretion is somewhat cabined in insofar as Ferguson cannot take actions with the intent of avoiding or reducing the earn out whether those actions be direct or indirect. And that's the only provision in the agreement that discusses post transaction conduct. Your Honor, it's a long agreement, but I will say I think for purposes of this case, it's the only relevant provision we're dealing with in terms of post acquisition. The 12 month rule that I discussed earlier, I discussed how Ferguson's implementation of that 12 month rule and signature was done with the intent to avoid the earn out under Kentucky's definition of intent. But that 12 month rule also lends itself to another error in the district court's opinion dismissing the amended complaint. And that is the district court erroneously drew inferences in Ferguson's favor, which is completely contrary to the 12B6 case law. It says all reasonable inferences must be drawn in the plaintiff's favor. Specifically, the district court inferred that Ferguson could not have imposed the 12 month rule on signature, the rule I discussed earlier, with the intent to avoid the 2018 earn out because Mr. Butler received the 2017 earn out the prior year, notwithstanding the existence of this 12 month rule. But even though Ferguson's imposition of the 12 month rule did not have its intended effect in 2017 does not make it reasonable to infer that Ferguson did not take the same action in 2018 with the intent to avoid the earn out payment. This is especially true since the trading profit threshold that had to be met to trigger the earn out obligation increased by almost $4 million from 2017 to 2018. So the 12 month rule was far more likely to and did allow Ferguson to avoid the earn out payment in 2018. Relatedly, to the extent Ferguson would argue that we didn't know the 12 month rule had these effects, again, Mr. Butler told Ferguson's vice president of the problems the 12 month rule was creating for the business. And in response, Ferguson promised to repeal the rule and make a credit to the trading profit, which again demonstrates its intent to avoid the earn out. Your honors, there is one other point I wanted to discuss with respect to the 12 month rule and a district court's opinion with respect to the 12 month rule. And that is the district courts incorrect interpretation of how that promise I discussed earlier, the promise credit operated. All right, Mr. Marcus, you're out of time. You can use your rebuttal now if you want. I'll reserve. Okay, very good. All right, let's hear from counsel for the FLE. Good afternoon, your honor. My name is Marcel DuPamel. May it please the court. I represent Ferguson, the FLE. The district court got it right. This court should affirm for three fundamental reasons. The district court properly applied Hick ball, which was an intent case and refused to make unreasonable inferences that aren't positively suggested by actual allegations of fact. Second, the district court correctly understood that Mr. Butler's allegations simply make no economic sense and they are not plausible. And finally, the district court correctly understood that Mr. Butler can't state a claim for indemnification under the contract if Ferguson didn't breach the contract. Well, before you move on, I don't quite understand that. I saw the indemnification provision as really a separate provision that if a party believes they have a claim for indemnification, they give notice. And once the notice is given, there has to be an objection to it. If there is no objection, then indemnification proceeds. That's, what is it? It's titled non-third party claims provision. I mean, it's a whole separate provision separate from the rest of the contract. And isn't that just a specific provision about indemnification? I think it is your honor. I agree with you. Okay. The district judge said it could not proceed because the contract provisions were not breached, but I see this as a separate provision, separate promises, separate obligations of a claim for notice, but there's no objection. And therefore under this paragraph, we are entitled to indemnification irrespective of the contract matters. I mean, what's wrong with that? Well, two things. First, they didn't give proper notice. I know that's one of your arguments, but assuming that, I mean, you're saying it rises and falls with a contract, but I don't read it that way. Tell me, tell me why I'm reading it wrong. Well, I'll tell you, your honor, this is why if there was no underlying breach of the contract, there was no loss against which to it's no loss. Okay. It's, it's really, I think that's simple in order for there to be a loss, there has to have been an underlying breach. Could there be a loss without a breach? I don't think so. Your honor. Not, not the way that contract is right. Okay. All right. Go ahead. I'm sorry to interrupt you. That's quite all right. Your honor. This court should simply apply the rule that is effectively announced by Higginbotham. It's not proper under rule eight for a district court to infer intent from allegations that aren't plausible. Remember that this contract gives Ferguson sole discretion to operate the company, however it wants. And Ferguson bought that privilege for $210 million. The only limit. You've got the second clause though, as long as it's not with the intent to precisely term the price. Okay. Well, but there has to be factual allegations that give rise to a reasonable inference that Ferguson's actions were motivated by a desire specifically to avoid burnout. Okay. Our court rules require that fraud be pled specifically. Do our court rules also require that intent be pled specifically? The court in Iqbal answered that precise question. The plaintiff in that case referred to rule nine, pointed out that intent can be pled generally and said, therefore I went. And the Supreme court said, not so fast, but the Supreme court said, and this is a quote, rule eight does not empower respondent to plead the bare elements of this cause of action, affix the label general allegation and expect his complaint to survive a motion to dismiss. The simple fact is Iqbal changed the rules of the under Iqbal and Twombly. It's as simple as that. What the court in Iqbal and Twombly said is that allegations of intent, for example, or allegations of an antitrust conspiracy, which was what existed in Twombly are insufficient. If they're not supported by actual allegations of fact that if accepted by the court would reasonably lead to a suggestion of liability on the part of the defendant. And the district court here looked very closely at each one of these four actions and concluded that none of them plausibly suggest that Ferguson acted with the intent to avoid the burnout payment. Let's look at the 12 month rule, which my opponent spent a fair bit of time discussing just a few moments ago. Paragraph 59 of the complaint alleges that we impose that rule in order to disincentivize sales of new and unique products by signature. That makes no sense. The district court understood that that makes no sense, that Ferguson would spend $210 million, buy a company, and then immediately set about to try to make that very company's fundamental business no longer that company's fundamental business. That's implausible, but that's what's alleged in the complaint. Similarly, the complaint focuses on the termination of Mr. Butler. Before you get into that, let's talk a little bit more about the 12 month rule. As I understand, the allegation is that in order to have the new and unique products, you have to allow for them to be an inventory longer than 12 months because for whatever reason, it takes that long for customers to be able to adapt or be interested in the product. Is that not what they're alleging for why they need more than 12 months to have new and unique products? That is what they're alleging. That's correct. Why are you saying that's implausible? We're not claiming that that allegation of fact is necessarily implausible or wrong, but what is implausible is the notion that the reason we impose that rule was to try to tank the company, which is in effect what they are claiming. What they are alleging is that we bought this company, and then in 2016, immediately tried to tank it so that we could avoid a relatively small earn out payment, not the following year, but the year after that. As the district court understood it, it just doesn't make sense. We're not asking this is a fact for the jury to figure out. Not in the absence of plausible allegations that give rise to a reasonable inference of intent. But the plausibility is a pretty weak read, it seems to me, to rest on, to say you haven't even pled anything sufficient to permit this case to go forward. Plausibility is a judgment. Seems to me to be a bit premature here, but go ahead. Well, the only answer I have to that, Your Honor, is that the Supreme Court has twice held that the standard now is plausibility. That is the standard that the Supreme Court has directed courts to use to assess allegations under Rule 12 of the East States Constitution. On the topic of determinations, the court noted that this allegation is, as the court put it, highly improbable. Mr. Butler essentially alleges that he was so instrumental to the company that the only reason to terminate him was to destroy the business as an ongoing concern. But again, it makes no sense that Ferguson would have paid $210 million for a company and then intentionally taken steps to destroy the profitability of the company for the sole purpose of avoiding an earn-out. It simply doesn't make sense, and the district court understood that. The district court found those allegations highly improbable. The same is true— Isn't the profit just shifted from signature to Ferguson? The money still comes in, but if it's allocated to signature, then you're required to pay this bonus payment. But if the money is allocated to Ferguson, you're not. Why is it not plausible that you're really doing this 12-month rule and all these other things really as a bookkeeping mechanism just so the profit shifts? That's all. To assess that, Your Honor, you have to look at each of these four alleged actions and assess whether or not there are allegations of voter. Most of these allegations suggest not that the company was moving profit from signature to Ferguson, but instead that the company was destroying profit outright. Ferguson is trying to lose money overall by these actions? Well, that's what the allegations say. I think the allegation is they're just shifting the profits from one company signature to the other company Ferguson. That's my understanding of what they're alleging. Nothing in the complaint suggests that we fired Mr. Butler because we were going to somehow move profits from signature up to Ferguson. He alleges that firing him caused the company to tank outright. That's his allegation. That's what caused the district court to say, but that doesn't make sense. The same with the 12-month rule. There's nothing inherent in the 12-month rule that suggests that all we're doing is moving money from signature to Ferguson. Why do you need the 12-month rule? I don't know why the 12-month rule is in place and there aren't allegations about that, but there are allegations in the complaint that the purpose of the 12-month rule is to disincentivize the company from buying and selling products. That's not about shifting profit. Isn't that what Signature did though? They were in the business? Buying and selling products? Yes, your honor. That's how they made the profit. The 12-month rule hurts the business model that Signature had, right? It may or it may not, your honor, but there's nothing in the contract that prohibits Ferguson from taking steps that Mr. Butler doesn't like or even from running the company poorly. The question is, one question only, can one infer from these allegations that the reason Ferguson employed the 12-month rule was to defeat Signature's profits? And again, the allegations in the complaint control here. And what Mr. Butler alleges is that the 12-month rule disincentivized Signature's profit, not that it moved profit, but imposing the 12-month rule hamstrung the company, period. It doesn't make sense that Ferguson would pay $210 million for a company and then immediately sabotage it. Well, I mean, was Signature a competitor of Ferguson? There aren't any allegations about that, your honor, and I don't want to speculate about it, I mean, I thought they were kind of in the same industry, weren't they, or am I wrong? I don't know, your honor, and I'm not going to speculate about that. Other than this, there is no allegation in the complaint, for example, that Ferguson bought Signature simply to put it out of business, right? There's no allegation to that effect, so if that's what the court is suggesting. I think they wanted to take their business and make it Ferguson's business, but okay. Which, of course, they're allowed to do under the contract. In fact, that's why companies buy other companies in the first place. We bought Signature because it sold stuff we wanted to sell. It's as simple as that, and we have the right to do that. The only- Was this provision that I was asking about, the 1.06j provision, is that a unique provision to this contract, or is this something in the- this notion of the acquirer forbidding from taking action detrimental to the earn out of the acquired company? It's not entirely unique. There are other cases of discussing contracts with similar language. Lazard, for example, which is a transferee court decision from Delaware. There are many of these earn out provisions have other restrictions, however, on the acquirer's conduct. For example, most of the decisions that are cited in Signature's brief involve cases where there were other restrictions with respect to the earn out. This one, the only restriction is that you cannot act with the purpose of avoiding the earn. Yeah. Purpose or intent. Yeah. I guess I'm struggling with the notion that whenever you have an acquisition normally, yeah, you're right. The acquiring company can do whatever they want with the acquired company, but since you have this carve out, where does it begin and end? Um, and I'm just, I'm just concerned. I think ultimately you may be right in the case, but I'm not sure whether at the motion to dismiss stage, you really have enough here to say that it's not, that they don't have a, at least have a plausible theory. I have to refer back to Iqbal, which was also an intent case. The court there found that simply saying intent isn't enough, that in order to state a claim for intent, one must plead facts that if true, plausibly, reasonably suggest that the defendant is liable. Under Connelly v. Gibson, before Iqbal and Twombly, saying intent was enough, arguably. All right. Counsel, you're out of time. Any, any further questions? Judge Batchelder? Judge Bush? No. All right. Thank you for your argument. Three minutes rebuttal, Mr. Marcus. Thank you, your honor. I have to clarify right out of the gate. We are not alleging that Ferguson tried to tank signature. To the contrary, what we're alleging is that the actions Ferguson took were largely paper actions that made economic sense for Ferguson as the parent company. With respect to the 12-month rule, remember, that rule did not reduce the amount of money that Signature made, but it artificially depressed Signature's trading profit, which saved Ferguson millions of dollars because the trading profit was the yardstick to determine whether or not the earn out obligation had been triggered. The second action we discuss in the Ferguson sold Signature's products in its showroom in order to shift Signature's e-commerce sales to Ferguson showrooms. Like the 12-month rule, this scheme did make economic sense for Ferguson. It wasn't done to tank the company. The sales that were the subject of the scheme did not disappear. They were merely shifted from Signature to Ferguson. Shifting sales from Signature to Ferguson resulted in a net gain for Ferguson because its revenues as Signature's parent remained the same or even increased, but its expenses decreased by millions of dollars due to its avoidance of the earn out obligation. Again, Signature's profits became Ferguson's profits, but Ferguson's profits from its non-signature assets did not become Signature's profits. And one action we also made economic sense that was not addressed by Ferguson's counsel was the payment of the unearned bonuses. So as I mentioned earlier, in January of 2018, Ferguson decided to cancel the incentive-based bonus program and place its signature and pay Signature's employees bonuses irrespective of Signature's financial performance. And that's who made economic sense to Ferguson. We explained in paragraph 87 of our amended complaint that Ferguson was able to adjust for each of the aforementioned negative impacts on the company's profit, namely the impact created by the payment of the unearned bonuses with the savings it realized by not paying Mr. Butler the amount of the earn out he was entitled to. And the other point I wanted to address, I see I'm running out of time, was that counsel's point that simply stating intent is not enough. Your Honor, this is not an amended complaint that simply contains a threadbare conclusion of intent. We've detailed over 26 pages, four different courses of conduct that Ferguson took with the intent of avoiding or reducing this earn out payment and explained why it was in Ferguson's interest and how Ferguson had the means, motive, and opportunity to carry out these four actions, all with the intent to avoid the earn out without hurting itself financially. Your Honor, I see that I'm out of time. Unless the court has any questions, I'll conclude. All right. Judge Batchelor, any further questions? No, I'm good. Judge Bush. All right. Thank you, counsel, for your argument. We appreciate it. Case will be submitted. You may call the next case. Thank you, Your Honor.